**ZLOTNICK v. CRISP et al.**

No. 10443.

United States Court of Appeals
District of Columbia Circuit.

Oct. 23, 1950.

Mr. Irving B. Yochelson, Washington, D. C., with whom Messrs. Solomon Grossberg and Isadore Brill, Washington, D. C., were on the brief, for appellant.

Mr. James C. Toomey, Washington, D. C., for appellee Crisp.

Mr. Leo A. Rover, Washington, D. C., for appellee Broadmoor Cooperative Apartments, Inc.

Before EDGERTON, PRETTYMAN, and BAZELON, Circuit Judges.

EDGERTON, Circuit Judge.

In August 1948 Broadmoor Co-operative Apartments, Inc., hereafter called Broadmoor, bought the Broadmoor Apartments building. Appellant Zlotnick had occupied apartment 102 for over 20 years. It and the adjoining apartment 100 originally had one bedroom each, but in 1931 the bedroom of 100 was detached and added to 102.

Broadmoor set out to restore the building largely to its original condition, sell the apartments to individuals, and operate on what is called a "cooperative" basis. Floor plans and a prospectus were prepared describing the apartments and the proposed alterations. They showed that the bedroom which had been added to 102 was to be returned to 100, so that each would have one bedroom. Copies of the floor plans were posted on the wall of the office where sales were made and on the desk where contracts were signed. There was testimony that copies were handed to each purchaser or prospective purchaser. Copies of the prospectus were put in the mailboxes of tenants.

Apartments 100 and 102, as one-bedroom apartments, were priced at $13,000. Other one-bedroom apartments ranged from $10,000 to $14,000. Apartments with two bedrooms ranged from $17,500 to $20,000. These prices were advertised in the prospectus.

On September 24, 1948 Broadmoor sold apartment 100 to appellee Crisp for $13,000. Both Crisp and Broadmoor understood that one bedroom was to be detached from 102 and restored to 100. Zlotnick refused to surrender this bedroom. Crisp

filed a complaint against Zlotnick, for possession of the room, in the Landlord and Tenant Branch of the Municipal Court. Zlotnick answered that he owned the room and that the Municipal Court had no jurisdiction because the issue involved title to real estate. The case was transferred to the District Court and Zlotnick made Broadmoor a third-party defendant.

Zlotnick claims that apartment 102 as it stood, containing the room in dispute, had been sold to him and that the subsequent sale of the room to Crisp was therefore invalid. It is not disputed that on August 25, 1948 Zlotnick signed a deposit agreement which described the apartment only as "apartment 102." [1] He testified he had not seen the prospectus and that he did not know a bedroom was to be detached. But the witness Flynn, Broadmoor's president, testified that Zlotnick had a prospectus in his hand when he came in to sign the deposit agreement and that they discussed the number of bedrooms as well as the range of prices. A "perpetual use and equity contract" bearing Zlotnick's signature, dated August 25, 1948 but actually signed at some later time, states that the apartment has "foyer, kitchen, dining room, porch, living room, bedroom and bath". Zlotnick testified that this contract was in blank when he signed it. But he admitted he had been in business over thirty years without ever signing a contract in blank. He testified that no floor plan was attached when he signed this contract, but according to the witness Flynn all use and equity contracts were filled out and had floor plans attached when they were signed, and they were always gone over with purchasers; no purchasers signed in blank.

Zlotnick paid $13,000 for apartment 102. He testified he thought this enough, though he believed the apartment had two bedrooms, because it was on the ground floor near the service entrance, and noisy, and because it had rented for $30 or $35 a month less than other two-bedroom apartments.

■■ The District Court found in substance that Broadmoor intended to sell to Zlotnick a one-bedroom apartment and Zlotnick intended to buy a two-bedroom apartment. The court concluded that this essential misunderstanding as to what was being bought and sold prevented any valid contract of sale from being made. The contract of sale, if any, was the deposit agreement. The court evidently thought that because of the unusual circumstances, the term "apartment 102" in the deposit agreement was ambiguous and might mean either (1) apartment 102 as it then was or (2) apartment 102 as (a) both parties knew it had been, (b) one and perhaps both of the parties knew it would be, and (c) a published prospectus and floor plan showed it would be; and that Zlotnick reasonably understood the term in the first sense and Broadmoor in the second. We do not think this view of the facts clearly erroneous.[2] It supports the court's conclusion. In law as elsewhere, what would be unambiguous in ordinary circumstances may be ambiguous in special circumstances. As Mr. Williston says: "If every word and every act had but one permissible meaning, it would never be necessary in considering the formation of contracts to inquire into the intent of a speaker or actor; but since this is not the case, if an expression, in view of the circumstances under which it was used, may fairly mean either of two things, each party is at liberty to attach his own meaning * * *." Williston, Contracts (1936 ed.) § 95.

■ Since the sale of apartment 102 to Zlotnick failed it follows, as the court found, that Crisp became the owner of the

1. On the same sheet of paper, but not in the agreement, and, as undisputed testimony showed, merely to indicate that "references" were unnecessary, Zlotnick was identified as "present tenant of Apt."

2. It is of course immaterial that the same might be said of various different views of the facts, one or another of which we might have chosen. For example, my own view might have been that both parties understood "apartment 102" in the second sense. But the question whether the term was ambiguous and, if so, what the parties reasonably understood it to mean was eminently one for the trier of the facts.

disputed bedroom and was entitled to its possession. The District of Columbia Emergency Rent Act authorizes a landlord to recover possession for his immediate personal use and occupancy. D.C.Code (1940) Supp. VII, § 45—1605(b) (2).

The court held Zlotnick responsible for the full rent of apartment 102, with credit for certain payments made by him, "until the date of surrender of possession of said apartment * * *." We think he should have been required to pay the full rent only until he surrendered either the apartment or, the disputed room. If he occupied what was left of the apartment after surrendering this room, the rent should be determined in accordance with law.

Modified and affirmed.

PRETTYMAN, Circuit Judge (dissenting).

Zlotnick had occupied Apartment 102 at the Broadmoor for twenty years. It was a two-bedroom apartment and had been a two-bedroom apartment for seventeen years. There was no sham, pretense or confusion about it; if you walked into No. 102 there were two bedrooms. The next-door apartment, No. 100, had no bedroom as such; it was and had been for seventeen years a so-called efficiency apartment. In August, 1948, the Broadmoor Cooperative Apartments, Inc., a newly organized Delaware corporation, secured an option to buy the apartment house and announced that it would sell the apartments under "The Flynn 100% Co-operative Plan". When word of the proposal was received, Zlotnick went promptly to the office of the corporation and executed a written agreement in which he agreed to buy and the corporation agreed to sell him "apartment 102 in said Broadmoor Apartments". The corporate agent wrote on that agreement "Present tenant of Apt." That notation certainly showed that the corporation knew at. that moment that Zlotnick was buying the apartment of which he was a tenant. There was no so-called floor plan attached to that agreement, and no mention of a floor plan was made in the agreement.

Zlotnick made a cash deposit of $1,300 to bind the deal.

About two months later, on October 16th, the corporation wrote Zlotnick that the balance ($4,118.40) under his deposit agreement to purchase "Apartment No. 102" was due. Zlotnick sent his check for the $4,118.40 and a letter saying that it was "for the purchase of Apartment Number 102, The Broadmoor, presently occupied by the purchaser, Samuel D. Zlotnick." The corporation cashed the check, writing on the back thereof, "Balance due under Deposit Agreement for Purchase of Apartment 102, The Broadmoor Apartments, Wash., D. C. Presently occupied by Samuel D. Zlotnick." Thus Zlotnick again described the property he was buying as that which he was then occupying, and the vendor, in its own separate notation, described it the same way. No so-called floor plan was attached to either of these papers.

Meantime, in September, a month prior to the foregoing, appellee Crisp wanted to buy an apartment. She signed an agreement to purchase "apartment 100". As I have pointed out, Apartment 100 had been for seventeen years an efficiency apartment; it had no bedroom. Mrs. Crisp did not look at No. 100. She looked at No. 400 and was told that No. 100 was like it. No. 400 had a bedroom.

Under the holding of the court Zlotnick, who bought No. 102 "presently occupied by" him, got nothing and Mrs. Crisp, who bought No. 100, got not only No. 100 as it was but also part of No. 102. With all deference to my brethren, I simply cannot agree.

I had thought, as Mr. Williston indicates,[1] citing Judge Learned Hand in support, that if people express a contract in plain words, especially words accurately descriptive of a physical object, they have a contract, and it makes no difference that one of them claims to have meant something else; especially where the something else is not actually in existence at all.

The trial court held that there was "a mutual misunderstanding of fact". This court holds that there was an "essential mis-

1. Williston, Contracts §§ 94, 95 (Rev. ed. 1936).

understanding". This mutual or essential misunderstanding is held to vitiate Zlotnick's contract altogether; he has nothing. As I understand the law on this subject, manifested assent rather than actual mental assent is the essential element in a contract, and what one party may mean different from plain words used is immaterial. Only if the words used are ambiguous may actual intent be shown. So we look to see if the words used in the present case were ambiguous. The contract was made by the deposit agreement, the check, and the receipt. The court says the term "apartment 102" was ambiguous. I do not think so, because that apartment was a physical thing which had not changed for seventeen years, and it is agreed that no so-called floor plan was attached to that agreement, the check, or the receipt. But quite apart from that, the parties did not use the simple term "apartment 102". They—not just one of them but both of them independently—further described Apartment 102 as being presently occupied by Zlotnick. There was no shadow of ambiguity about what Zlotnick was then presently occupying.

As to "mutual" misunderstanding, certainly Zlotnick made no mistake. He wanted to buy No. 102 as it was then and as it had been for seventeen years, and he was specific in saying exactly that. The corporation says it made a mistake. It says that it meant to sell as No. 102 not what was then actually and physically No. 102 but what was to be reconstructed as No. 102. It says that the reconstruction was to be in accordance with a "Typical Floor Plan" printed and distributed sometime during August–November. The record is in complete confusion as to the time, style and method of distribution of these Plans, but some things are quite clear. In the first place, this plan did not purport to be an actual plan of Zlotnick's floor or any floor. There were eight floors. The plan purported to be a "typical floor plan". The numbers on the apartments were in tiers, e. g., 100, 200, 300, 400, etc., supposedly corresponding. But the fact was that, while the "typical floor plan" showed apartment "-00" with a bedroom, neither No. 200 nor No. 300 had a bedroom, No. 600 was combined as one apartment with No. 601, and No. 700 was nothing but a bedroom and bath. In other words, out of the seven floors (omitting the floor here in dispute) only the fourth, fifth and eighth actually corresponded with the "typical" plan. Under such circumstances, I do not see why Zlotnick should be held bound by the "typical" plan, or put on notice that it was supposed to represent a reconstruction of his apartment. In the next place this "typical floor plan" is on a Lilliputian scale, hardly decipherable. It shows the living room at less than one-half the size of a three-cent stamp; with the aid of a fairly good reading glass one can figure out the numbers of the apartments. Zlotnick was clear and specific about what he was buying. He wrote, and received in writing, "presently occupied by" Zlotnick. That is what he was buying. To say that his perfectly understandable description, made by him and repeated to him by the corporation, was offset by this microscopic enigma in print is neither just nor realistic, in my view.

The court says that the floor plans and prospectus described the proposed alterations. "Proposed alterations" were nowhere mentioned or described; they had to be figured out by comparing existing physical facts with infinitesimal architectural delineations.

The court mentions a "perpetual use and equity contract". But that contract was not executed until months after Zlotnick's contract was made; it was antedated by the corporation. In fact, the form used for that document had not even been printed when Zlotnick's contract was made. If it has any place whatever in this controversy, that agreement must come in as a modification of an existing contract, and it fails to meet even the most elementary legal tests of a valid modification.

The court refers to the witness Flynn, but a reading of his testimony shows, as I read it, that Flynn was not, and could not possibly have been, testifying upon direct recollection of the circumstances as to Zlotnick but was obviously inferring and deducing from what he recollected about the general course of his action. The court also mentions as a factor that the

price of Zlotnick's apartment was below that of other two-bedroom apartments. But it is undisputed that this was the least desirable apartment in the building, being on the second floor directly over the service entrance where trucks noisily came and went about dawn. The rent on this apartment had for many years been materially less than that for other two-bedroom suites; the selling price should have been materially lower than that for other apartments of similar size.

In the classic language of the lawbooks my view of the unadorned legal proposition would appear thus: A owns Blackacre, and B has been his tenant for many years. A agrees to sell and B agrees to buy "Blackacre". But A has been planning to divide Blackacre into Blackacre and Whiteacre and has a drawing depicting that plan on his office wall. Even if the agreement to sell and the papers auxiliary to that agreement, i. e., the check and the receipt, describe the property merely as "Blackacre", the rule should be that if the landlord intends to sell to his tenant only a subdivided portion of Blackacre it is incumbent upon him to make plain beyond dispute and in writing the intended variation from existing boundaries. And if the contractual documents describe the property as "Blackacre, presently occupied by B", there is no room for debate: A has sold to B Blackacre as it has been for many years; he has not sold merely the partial acreage to which he is planning to reduce the property presently known as Blackacre.

I have gone to this length in what appears to be a very minor dispute because it seems to me that a public policy in commercial affairs is involved. I very much doubt the social validity of *caveat emptor* under any circumstances, and so I would confine that doctrine of law to the narrowest established limits. The present decision carries it to the farthest possible limit. Zlotnick, the court holds, has no contract. To me this is not sound law and still less sound policy.